ASHER *v.* STATE OF INDIANA.

[No. 30,854. Filed February 3, 1969. Rehearing denied March 14, 1969.]

*Johnson & Weaver,* of Indianapolis, for appellant.

*John J. Dillon,* Attorney General, *Robert R. Yeager,* Deputy Attorney General, for appellee.

ARTERBURN, J.—The appellant was charged by affidavit and found guilty of the crime of robbery. The only issue presented in appellant's brief is that "no reasonable man could find the appellant guilty on the evidence submitted to the jury." It is contended "that the only evidence against the defendant was the uncorroborated testimony of an alleged accomplice and such uncorroborated testimony was refuted by independent, unrebutted and unchallenged testimony on behalf of this defendant."

The evidence shows that the Burger Chef restaurant on South Madison in Indianapolis was robbed by two gunmen

about 11:20 p.m. on April 26, 1964. None of the employees of the Burger Chef saw or heard the vehicle in which the two robbers came or in which they made their escape. The same night about 12:30 a.m. the police brought Robert U. Brown and Donnie Richey to the Burger Chef, where Brown was immediately identified by all three employees as one of the robbers. Brown implicated appellant Asher and his co-defendant, Oie Willoughby. Brown testified that Asher had approached him and suggested that they make some dishonest money together, and he introduced him to Willoughby and together they discussed "scores" possibilities, that they drove around Indianapolis in a taxicab and looked at and discussed possible places for holdups.

The accomplice Brown testified that he, Asher and Willoughby decided they would rob the Burger Chef restaurant. Pursuant to this plan they left Brown's apartment between 10:00 p.m. and 10:30 p.m. on the night of the robbery and arrived at the restaurant between 10:30 p.m. and 11:00 p.m. Asher waited in the cab while Brown and Willoughby robbed the restaurant. After the robbery had been completed, Asher returned Brown and Willoughby close to Brown's apartment and let them out. About ten or fifteen minutes after Brown and Willoughby had arrived in the bedroom of Brown's apartment, Asher came in, helped divide the money taken in the robbery, and left about fifteen minutes later, which was around 12:00 p.m.

Corroborating evidence which the appellant contends was "only minor corroboration" was given by a witness, Donnie Richey, who testified to substantially what Brown related occurred at Brown's apartment, namely, that Brown returned to his apartment about 12:00 p.m. on the night of the robbery, that Asher came in about ten minutes later and went into a bedroom where Brown and Willoughby were. They stayed about fifteen minutes and left, and while they were in the bedroom he heard what sounded like the handling of a considerable amount of money and change. According to Brown's

testimony they divided the money three ways in his apartment, and he got $317.00.

The appellant attempts to get us, as a court of appeals, to disregard the testimony of an accomplice or, in the alternative, consider the evidence of Brown as "inherently improbable and runs counter to human experience."

It has long been the law in Indiana that the testimony of an accomplice, if otherwise competent as a witness, may be accepted by the jury and believed, and in such event is sufficient evidence for conviction. *Fitzgerald* v. *State* (1966), 248 Ind. 19, 219 N. E. 2d 603; *Mavrick* v. *State* (1965), 247 Ind. 77, 210 N. E. 2d 426; *Couch* v. *State* (1965), 246 Ind. 531, 207 N. E. 2d 365; *Smith* v. *State* (1961), 241 Ind. 601, 174 N. E. 2d 47.

Burns' Indiana Stat. Anno. § 9-1603 provides specifically that "accomplice, when they consent to testify" are competent witnesses. Once a witness had been found to be competent, the amount of weight to be given the testimony is one for the jury or the trier of the facts, and not for this appellate court. As stated by Judge Emmert in *Kraus* v. *Kraus* (1956), 235 Ind. 325, 328, 132 N. E. 2d 608, 610:

> "When an issue concerning the credibility of witnesses or the weight of the evidence is presented for our determination on appeal, we should clearly avoid any tendency to place ourselves upon the trial bench and usurp the functions of the trial judge. We are dealing with a cold record and cannot observe the witnesses, their conduct, and manner of testimony while on the witness stand."

This rule is applicable both in civil and criminal cases. In *Jackson* v. *State* (1924), 194 Ind. 561, 562, 143 N. E. 625, this Court said:

> "Questions as to the credibility of witnesses, and as to what inferences shall be drawn from the facts proved are for the jury and the trial court, and if part of the evidence, standing alone, would justify a finding of guilty, this court

cannot set aside the verdict of guilty because of other evidence to the contrary."

This was further supported by the statement in the case of *Hammond* v. *State* (1928), 200 Ind. 343, 344, 163 N. E. 262, 263: "It was the duty of the jury to determine if this witness told the truth in the trial under consideration."

In addition to the testimony of the accomplice in this case, the jury also heard a corroboration of that testimony by Donnie Richey, which also tended to show the guilt of the accused. The conflicting testimony was presented to the jury, and as a result of their weighing the evidence the conclusion of guilt was reached. On appeal we look only to the evidence most favorable to the state to see if there is enough evidence to support the conviction, which in this case there plainly is. For an appellate court to go beyond this role is an invasion of the function of the trial court.

The judgment of the trial court is affirmed.

DeBruler, C. J., Hunter and Givan, JJ., concur.

Jackson, J., dissents with opinion.

### DISSENTING OPINION

JACKSON, J.—I am unable to agree with the majority opinion herein and dissent thereto.

Appellant and one Oie Willoughby were charged by affidavit filed in Marion Criminal Court, Room 2, Marion County, Indiana, with the crime of robbery. Appellant entered a plea of not guilty to the charge. Appellant also filed notice of alibi to which the State filed written answer. Trial was had by jury which returned a verdict finding appellant guilty as charged in the affidavit. At the conclusion of the State's evidence appellant moved for a directed verdict of acquittal which motion was denied by the court. At the conclusion of all the evidence appellant moved for discharge which motion was overruled by the court. Appellant filed a motion for a

new trial which was overruled. Appellant was sentenced to the Indiana State Prison for not less than ten (10) years nor more than twenty-five (25) years and disfranchised for one year. From such verdict, judgment and sentence stems this appeal.

The affidavit charging appellant and his co-defendant, omitting formal parts, signature and jurat, in pertinent part reads as follows:

"BE IT REMEMBERED, That, on this day before me, NOBLE R. PEARCY Prosecuting Attorney of the Nineteenth Judicial Circuit, personally came DONALD W. CARLISLE who, being duly sworn, upon his oath says that OIE WILLOUGHBY AND S. W. ASHER on or about the 26th day of APRIL, A.D. 1964, at and in the County of Marion in the State of Indiana, did then and there unlawfully, feloniously, forcibly by violence and putting MICHAEL GLENN in fear, take from the person and possession of the said MICHAEL GLENN, money then and there of the value of ONE THOUSAND TWO-HUNDRED AND NINETY-FIVE DOLLARS AND NINETY-SIX CENTS in lawful money, which property the said MICHAEL GLENN then and there lawfully held in his possession and was then and there the property of BURGER CHEF SYSTEMS, INC., A CORPORATION, then and there being contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Indiana."

Appellant's notice of alibi, omitting formal parts thereof, reads as follows:

"Notice is hereby given that the defendant, S. W. Asher, proposes to offer his defense to the charge in the indictment evidence of alibi.

"Said alibi will pertain to the 26th day of April, 1964, the date of the alleged robbery.

"The defendant, S. W. Asher, was on the 26th day of April, 1964, for the 24 hours including the 26th day of April, 1964, in the following places, to-wit: various places in the City of Indianapolis and Marion County but at no time any farther south than Morris Street on the south side of the City of Indianapolis, Indiana; that on Saturday, April 25, 1964, and up until 2:00 A.M., April 26, 1964, defendant operated a certain Yellow cab [sic] taxicab in his

occupation as a taxicab driver and that he took the said taxicab to his home at 2:00 A.M. on April 26, 1964, and went to bed; that he arose from bed about 9:30 A.M. on said date and left for work again between 10:00 and 11:00 A.M. on said date and went to downtown Indianapolis to the bus terminal and the Union Station and had many trips back and forth with many passengers on said date until 11:30 P.M. approximately on April 26, 1964, checking his cab in to the Yellow Cab office at about 11:40 P.M. on said date; that the only points south of Washington Street in Indianapolis involved in these trips in the taxicab were to the Fountain Square neighborhood and possibly one trip to the Weir Cook Municipal Airport.

"The above named defendant, S. W. Asher, by virtue of the provisions of Burns' Revised Statutes of Indiana, Section 9-1632, does hereby expressly require the Prosecuting Attorney for the Nineteenth Judicial Circuit to file and serve upon the defendant, S. W. Asher, or his Counsel, a specific statement in regard to, and fixing the exact date and time at which the prosecution proposes to present at the trial as the date and time of the alleged robbery alleged in the indictment. That said Prosecuting Attorney as aforesaid be required also to inform defendant or his Counsel, the exact place within which the prosecution proposes to present as to the place of the commission of the said crime alleged in the indictment."

Appellee's answer to the above notice, omitting formal parts and signature, reads as follows:

"Comes now Noble R. Pearcy, Prosecuting Attorney for the Nineteenth Judicial Circuit, by his deputy, and respectfully states to the Court as follows:

"1. The date which the prosecution proposes to present at the trial of the above-entitled cause as the date when the defendant committed the offense charged was: April 26, 1964.

"2. The place which the prosecution proposes to present at the trial of the above-entitled cause as the place where the defendant committed the offense charged was: 4909 South Madison Avenue, Indianapolis, Marion County, Indiana."

The trial of the cause commenced June 21, 1965, and concluded June 23, 1965, at the conclusion thereof the jury re-

turned its verdict, which omitting formal parts and signature of the foreman, reads in pertinent part as follows:

"We, the Jury, find the defendant, S. W. ASHER, guilty of robbery as charged in the Affidavit and that he be disfranchised and rendered incapable of holding any office of trust or profit for one (1) year, and we further find that the age of the defendant is 38."

Thereupon the court asked the defendants if they cared to poll the jury, the defendants declining the court ordered Pre-commitment Investigation Report be made and fixed July 9, 1965, 9:30 A.M. for sentencing.

On July 9, 1965, the pre-commitment investigation report having previously been filed and examined by the court, the court pronounced judgment and imposed sentence on the verdict of the jury. Such judgment and sentence in pertinent part reading as follows:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the defendants each be sentenced to the Indiana State Prison for not less than Ten (10) nor more than Twenty-five (25) years and each defendant disfranchised and rendered incapable of holding any office of trust or profit for One (1) year. Costs to be divided equally. Defendants each be permitted to remain on present bond pending Motion for New Trial."

Appellant's Motion for New Trial, omitting formal parts and signature, in pertinent part reads as follows:

"The defendant, S. W. Asher, in the above-entitled cause moves for a new trial herein on each of the following grounds:

"1. The verdict of the jury is contrary to law.

"2. The verdict of the jury is not sustained by sufficient evidence.

"3. The verdict of the jury is not sustained by sufficient evidence and is contrary to law for the reason that the only evidence against this defendant was the uncorroborated testimony of an alleged accomplice, and such uncorroborated testimony was refuted by independent, unrebutted and un-challenged testimony on behalf of this defendant.

"4. Irregularity in the proceeding of the Court and order of the Court and abuse of discretion by which this defendant was prevented from having a fair trial, in this, to-wit:

"That the Court refused to give this defendant a separate trial after proper motion by this defendant.

"5. Error of Court and abuse of discretion in compelling defendant, S. W. Asher, to stand trial with a co-defendant who had a criminal record, including evidence of an acquittal for murder.

"6. Error of Court in refusing to give a directed verdict of 'not guilty' at the close of the State of Indiana's case.

"7. Error of Court in refusing to give a directed verdict of 'not guilty' at the close of the defendant's case.

"WHEREFORE, this defendant prays the Court for a new trial of said cause."

(N.B. Specifications 4 and 5 of the above motion are not argued in appellant's brief, are therefore waived and are not considered here on appeal.)

Appellant's Motion for New Trial was by the court overruled July 22, 1965.

Appellant's Assignment of Errors, omitting formal parts and signature, in pertinent part reads as follows:

"The appellant avers that there is manifest error in the judgment and proceedings in this cause, which is prejudicial to appellant, in this:

"1. The court erred in overruling appellant's motion for a new trial.

"2. The court erred in refusing to give this appellant a separate trial."

The State of Indiana in the case at bar parades a total of thirteen witnesses to the witness stand, only two of whom in any wise connected appellant with the crime charged in the affidavit. One of these two was Donnie Richey, the delinquent

child* boy friend of Ralph U. Brown, an admitted participant in the robbery at the Burger Chef, who was an escaped convict. Richey testified that appellant came to Brown's apartment about 12:00 o'clock on the night of April 26, 1964, after Willoughby and Brown had arrived and were in the other room, while he, Richey, stayed in the kitchen and listened to the radio. He testified he let Sam (Asher) in the apartment and Sam went into the other room with Willoughby and Brown. He testified he heard change being counted. This was the first time he saw Sam.

The only other witness who placed appellant at the scene of the crime and accused him of planning or helping plan the robbery was Ralph U. Brown, an admitted participant, now serving time for this robbery, also for other prior offenses. It is from testimony of these two witnesses alone that a summary of the evidence most favorable to the State can be made. It appears as follows.

The Burger Chef restaurant at 4904 South Madison Avenue in Indianapolis, Marion County, Indiana, was robbed by two gunmen at about 11:20 p.m. on Sunday, April 26, 1964. The robbers left at approximately 11:30 p.m. None of the employees of the Burger Chef saw or heard the vehicle in which the robbers came or in which they escaped.

About an hour and a half later, at approximately 1:30 a.m. April 27, 1964, the police brought Ralph U. Brown and Donnie

---

* The words "delinquent child" shall include any boy under the full age of eighteen [18] years and any girl under the full age of eighteen [18] years who:

(6) Associates with immoral or vicious persons;

(10) Wanders about the streets of any city, or in [on] or about any highway or any public place between the hours of eleven [11:00] o'clock p.m. and five [5:00] o'clock a.m. without being on any lawful business or occupation, except returning home or to his place of abode after attending a religious or educational meeting or social function sponsored by a church or a school;

(15) Knowingly associates with thieves or other maliciously vicious persons;

(18) Deports himself so as to wilfully injure or endanger the person or property of himself or others.

Richey to the Burger Chef, where Brown was immediately identified by all three employees as one of the robbers.

When first confronted by the police, Brown told them his name was Robert Smith and gave them a fictitious address. Richey was present when Brown made these false statements but remained silent. Later Brown admitted his name and address, and signed a statement implicating the defendants Oie Willoughby and S. W. Asher in the stickup.

According to Brown, he had known Willoughby since 1940 when he said they were prison mates at Pendleton, and had known Asher since about a week prior to the Burger Chef robbery.

Brown's story was that Asher approached him with the suggestion they make some dishonest money together. Brown claimed he accepted Asher without question, introduced him to Willoughby, and together they discussed possible "scores." During the week prior to the robbery, according to Brown, Asher drove him around Indianapolis in his taxicab while they looked for and discussed possible targets for a holdup.

According to Brown's story, Asher, Willoughby and he met at Brown's apartment on Virginia Avenue, on the evening of the holdup. They left the apartment between 10:00 and 10:30 and arrived at the Burger Chef about 10:30 or 11:00. They rode around in the cab and planned their getaway. The car was parked at the "television place" on Thompson Road about a half block from the Burger Chef. Asher remained in the cab while Willoughby and Brown walked to the Burger Chef, performed the robbery and then returned to the cab. Asher then drove the cab to an alley on Elm Street which led to Brown's apartment, where Willoughby and Brown got out of the cab and walked to the apartment.

Brown's story was that when he and Willoughby arrived at his apartment his teen-age boy friend, Donnie Richey, was there playing records. Asher arrived ten or fifteen minutes later, went into another room where Brown and Willoughby

were and they divided the money. Brown said he got $317.00, Willoughby got a third and Asher got a third. Willoughby and Asher then left. Richey denied knowing anything about the robbery or the division of money.

After Asher and Willoughby had left the apartment Brown and Richey claimed they left the apartment and were walking southeast on Virginia towards a restaurant when they were stopped by the police. Both were returned to the scene of the robbery at the Burger Chef where Brown was positively identified as one of the robbers.

The appellant in support of his assignment of error No. 1 that the court erred in overruling appellant's motion for a new trial, urges five grounds of such motion, namely grounds 1, 2, 3, 6 and 7. (These grounds have been previously set out herein and are therefore here omitted.)

Appellant contends that the verdict is contrary to law and is not sustained by sufficient evidence for the reason that the only evidence against appellant was the testimony of his alleged accomplice, Ralph Brown, buttressed to a slight degree by the testimony of his boy friend, Donnie Richey, and that no reasonable man could have found the appellant guilty on such improbable and uncorroborated testimony, particularly in view of the unimpeached and uncontradicted evidence presented by the defendant-appellant.

Asher took the stand in his own behalf and categorically denied knowing Brown or that he had ever been in his cab, he never met Brown until Carlisle brought him out and said "This is Brown," that he knew nothing about the robbery at the Burger Chef, or that he had ever seen before the guns that were in evidence in the case. He testified he never owned a rifle or shotgun and never used a gun outside the army.

Asher testified that the only time he had as much as $300.00 in his life was when he was discharged from the Army and got some back pay. That approximately 3 months before April 26, 1964, he had made application through the State

Employment Office for another job and was supposed to go to work for Fairmount Glass at eight o'clock on Monday morning. He had notified Yellow Cab that Sunday would be the last day he would work there. He delivered the cab to the Company at 11:30, Freeman Marshall was waiting there for him and the cab. His wife was waiting there to pick him up and they drove straight home and went to bed. He testified that he did not go to work for Fairmount Glass the next morning as they told him something came up and they would call him the next week. He went to work for them the following Monday morning and stayed there for a year when there was a strike and he had to get another job. After leaving Fairmount Glass he was employed by Moody Drugs driving a truck. He had offered to take a lie detector test in connection with this case but the offer was refused.

Marie Asher, wife of appellant, testified they were married December 16, 1963, that she was living with her husband on April 26, 1964, worked then at Fairmount Glass and had made arrangements for her husband to get a job there, that he was to come to work the following week and had given the cab company notice. That on the 26th day of April, 1964, she had worked at Fairmount Glass from three until 11:00, she was to pick up her husband in her car, a 1962 Oldsmobile, that she met her husband at the cab company. She was there when he checked in at about 11:30. "I had waited maybe fifteen minutes before S. W. came in." A man was waiting there to take his cab from him. She could not give his name because she didn't know it. Curtis Brown, the dispatcher, was also there. He is the man the money is turned in to and he assigns cab drivers to cabs. She met her husband at about 11:30 and he did not leave her after 11:30 nor did he leave the house. She had never seen her husband with $300.00 to his name since she married him, the most she had seen him with was $160.00 when he worked at Fairmount Glass and pulled doubles. She was in the court room when her husband offered to take a lie detector test. They said "Let it ride."

James Lawson testified for the appellant. He was 20 years old, lived in an apartment at 250 N. Reisner and was employed by Pennsylvania R. R. as a yard brakeman and had been with them for a year and a half.

Lawson testified this was the third time he had seen Mr. Asher. The first time was about 11:00 p.m. Sunday, April 26, 1964, when he hailed his cab to take him to State and Washington Streets to the assistance of his landlady who had a flat tire there. He noticed Asher's picture, his name and number in the cab and asked if he was related to Wanda Asher. He replied yes, she was his niece. The witness had gone to school with the niece. Asher wrote his name and cab number on a piece of paper and gave it to the witness with the remark if he ever needed a cab to give his cab number and name. Asher pulled up next to Mary Blunk, the woman who had difficulty with her car, at 11:15. Nine days later the witness and some friends were in Walls Drug Store at 1800 Washington when Asher approached him and asked if he remembered him, that he had been in his cab, and told him of his predicament, the witness replied that he remembered him, that he still had his name in his pocketbook and took it out and showed it to him.

Curtis Brown, the night manager for Yellow Cab Company, testified in behalf of the appellant. He stated that his duties were to check cars in and out, and to collect money from the drivers and turn it over to the company. Brown testified that on the night of April 26, 1964, he checked appellant's car in at approximately 11:30 P.M. He stated that he was sure of the approximate time and date because appellant was quitting Yellow Cab Company that night, and it was necessary for Brown to check a new man in the cab appellant was driving. Brown reiterated this story on cross examination when he stated that he was sure of the time, "Because a guy was taking the cab over at midnight that night and he brought the cab in at 11:30."

Defendant Willoughby took the stand and testified in his own defense. In a number of instances he directly contradicted the testimony of Ralph U. Brown, and the state failed to introduce any evidence or witnesses in rebuttal. Whereas Brown stated that he knew Willoughby in 1940 while imprisoned in the State Reformatory at Pendleton, Willoughby stated that he and Brown were not at Pendleton at the same time. He further testified that he first saw Brown in the court room during the trial of the case. Willoughby testified he had never seen Asher before in his life until the day he saw him in court in connection with the trial of this case.

Willoughby's attorney, Joseph Mazelin, testified that as attorney for defendant Willoughby he went to the Marion County Jail and talked to Ralph Ulmer Brown about the robbery. Mazelin stated that he did not know appellant prior to the trial. The following portion of his testimony dealing with his conversation with Brown is set out in question and answer form as it appears in the transcript.

"Q. And you talked to Mr. Brown and asked what the facts were concerning the robbery and so forth?

A. I did.

Q. Tell the jury what he said to you?

A. I told him I wanted to talk to him about this robbery and asked him if he could tell me anything about it. He said, 'Well, Mazelin, I have committed so many robberies I don't even know half of them.'

Q. Tell the jury again what he said to you?

A. Well, I asked him how come he was making so many different stories about what occurred at this robbery and finally he said, 'Well, Mazelin, I have committed so many robberies and incidentally a couple where shooting was involved, I have been threatened if I don't testify against Willoughby they are going to charge me with all the charges as well as Habitual Criminal' but if he testified against Willoughby he would get ten years flat.

Q. And Habitual Criminal calls for life imprisonment, does it?

A. Yes, it does.

Q. Shooting someone while in a hold up calls for life?
A. Yes, it does.
Q. Did he ever mention Asher's name being connected?
A. He never did."

Ralph U. Brown's criminal record can perhaps be best set out by again reverting to questions and answers from the transcript. The following is an excerpt from direct examination by the prosecution.

"Q. Tell the court and jury how many times and for what you have been convicted?

A. I was in Juvenile Center twice when I was fourteen or fifteen. $25.00 and costs and thirty days in jail.

Q. What for?

A. I think Vehicle Taking, and I did a year on the Farm for First Degree Burglary, reduced to Grand Larceny. I did one to ten at Pendleton for Vehicle Taking and I did ten flat for armed robbery and I did ten flat for armed robbery again and I did one to ten and I am a ten flat and one to ten.

Q. What is the one to ten for?

A. First Degree Burglary, reduced to Grand Larceny. And that is all the record I got.

Q. You are doing ten flat now?

A. Yes.

Q. That is for the Burger Chef conviction?

A. That is right.

Q. You said you were an escapee at the time. Is that for the one to ten sentence?

A. That is right.

Q. Where had you escaped from?

A. The Indiana State Prison."

CROSS EXAMINATION OF RALPH U. BROWN

"Q. Had you been in six stick ups?

A. I don't know for sure."

State Police Detective Don Carlisle testified on cross examination that he "filed the criminal affidavit against Asher and Willoughby on the statements of Brown and Richey. *I did not let it go to the Grand Jury.*" (Emphasis supplied).

Appellant further argues that in this case, being a criminal action, the State is required to prove the defendant guilty beyond a reasonable doubt. Proof of reasonable doubt requires that each juror be so convinced by the evidence that as a prudent man he would feel safe to act upon such conviction in matters of the highest concern and importance to his own dearest and most important interest, under circumstances where there was no compulsion or coercion upon him to act at all. *Smith* v. *State* (1962), 243 Ind. 74, 79, 181 N. E. 2d 520; *Baker* v. *State* (1956), 236 Ind. 55, 61, 138 N. E. 2d 641; *Chambers* v. *State* (1953), 232 Ind. 349, 356, 111 N. E. 2d 816.

Appellant submits that in order to sustain a conviction in this case there must be substantial evidence from which a reasonable person could find him guilty beyond a reasonable doubt. This position is supported by the following cases. *Baker* v. *State, supra; Thomas* v. *State* (1958), 238 Ind. 658, 154 N. E. 2d 503; *Sylvester* v. *State* (1933), 205 Ind. 628, 633, 187 N. E. 669; *Riggs* v. *State* (1958), 237 Ind. 629, 632, 147 N. E. 2d 579; *Penn* v. *State* (1957), 237 Ind. 374, 378, 146 N. E. 2d 240; *Heglin* v. *State* (1957), 236 Ind. 350, 355, 140 N. E. 2d 98.

The testimony of accomplices should be closely scrutinized and cautiously received. *Sylvester* v. *State, supra;* 20 Am. Jur. 1087, 1235-1238.

In the case at bar appellant as a matter of practicality stands convicted on the sole testimony of his alleged accomplice, Ralph Brown, with only minor corroboration by Ralph Brown's boy friend Donnie Richey, and that contradicted by Richey himself. Brown was a felon with a long record of convictions and at the time of the alleged robbery was an escapee from the state farm, was an admitted and proven liar and was and is a confirmed criminal.

The uncontradicted and unimpeached testimony of the appellant, (whose only criminal record is that he was fined

for speeding), that of appellant's wife; that of his employer to the effect that on or about the time of the alleged robbery he was at the office of the Yellow Cab Company turning in his cab, as well as the testimony of a passenger in the cab driven by appellant that placed appellant many blocks from the scene of the robbery only minutes before it occurred, contradicts the story related by the alleged accomplice Brown.

The common law rule, permitting conviction on the uncorroborated testimony of an accomplice has been changed in many jurisdictions by statute expressly declaring that the uncorroborated testimony of an accomplice cannot sustain a conviction. See 20 American Jurisprudence, page 1088 and the cases cited under note 10.

This Court has also recognized the danger. In the case of *Sylvester* v. *State, supra,* on page 630 Chief Justice Myers speaking for the Court said the following:

"The only evidence connecting appellant in any manner with the stolen automobile came from the mouth of a single witness. That witness, the admitted thief, admitted highway robber and admitted deserter from the navy, was, as to each of his material statements concerning appellant's connection with the stolen car, directly contradicted by himself under oath by disinterested witnesses, by circumstantial evidence, and by physical facts. . . .

This court, for the past few years, has been confronted, as never before, with convictions resting entirely upon the testimony of criminals of the very worst type, and in a majority of these cases, before final disposition of them on appeal, our attention has been drawn to a petition for a writ of coram nobis based upon affidavits of the person or persons on whose testimony the conviction rested to the effect that their evidence given at the trial was wholly false and supplemented by a statement of alleged facts completely exonerating the defendant from criminality. In the instant case the reverse of the foregoing procedure took place below, but respect for the truth and the effect of an oath on the conscience of such witness is the same. Experience admonishes us that convictions resting upon the testimony alone of witnesses of the character the one in this case is shown to have, should be carefully scrutinized, not only by the jury so instructed in this case, but by the

court with the view of determining whether there was any substantial evidence before the jury to sustain each issuable fact. We use the word 'substantial' as meaning more than 'seeming or imaginary.' Whether the legally admitted evidence may tend to establish facts from which guilt may be reasonably inferred is a question of law for the trial court when presented by a motion for a *per*emptory instruction in favor of the defendant at the close of the state's evidence, or at the close of the entire evidence, or by a motion for a new trial for insufficient evidence. The action of the court on any one of these motions may be saved and presented for review on appeal."

Section 9-1806, Burns (1956 Repl.) [Acts 1905, Ch. 169, § 261, p. 584], as well as cases too numerous to cite, provide "A defendant is presumed to be innocent until the contrary is proved. When there is reasonable doubt whether his guilt is satisfactorily shown, he must be acquitted."

If the evidence merely tends to establish a suspicion of guilt, it is not sufficient to sustain a conviction. *Robertson* v. *State* (1952), 231 Ind. 368, 108 N. E. 2d 711; *Steffler* v. *State* (1952), 230 Ind. 557, 104 N. E. 2d 729; *Todd* v. *State* (1951), 230 Ind. 85, 90, 101 N. E. 2d 922.

"It is not enough that evidence merely tends to support the conclusion of guilt, it must support it." *Martin* v. *State* (1897), 148 Ind. 519, 521, 47 N. E. 930.

"In considering the standard by which we review the evidence where it is challenged as being insufficient to sustain a verdict or finding, this court has often said there must be substantial evidence of probative value before we can decide an accused has been proved guilty beyond a reasonable doubt. 'This last rule places the evidence before the court on appeal, not for the purpose of weighing it, or for the purpose of determining the facts when there is actual conflict, but for the purpose of deciding, as a question of law, whether or not there is substantive evidence in support of the required material facts essential to a conviction. It is not enough to sustain a conviction that the evidence, when given full faith and credit, may warrant a suspicion or amount to a scintilla.' *Sullivan* v. *State* (1927), 200 Ind. 43, 47, 161 N. E. 265; *Cleveland, etc., Ry. Co.* v. *Wynant* (1893), 134 Ind. 681, 686, 34 N. E. 569.

' . . . We use the word 'substantial' as meaning more than 'seeming or imaginary.' *Sylvester* v. *State* (1933), 205 Ind. 628, 631, 632, 187 N. E. 669.

'There must be some substantial evidence of probative value from which a reasonable inference of the guilt of the defendant may be drawn.' *Todd* v. *State* (1951), 230 Ind. 85, 90, 101 N. E. 2d 922, *supra.* 'This court cannot weigh evidence, but must determine whether there is substantial evidence of probative value from which a jury could reasonably have inferred that appellant was guilty of the crime.' *Stice* v. *State* (1950), 228 Ind. 144, 149, 89 N. E. 2d 915. See also *Christen* v. *State* (1950), 228 Ind. 30, 39, 40, 89 N. E. 2d 445; *Mattingly* v. *State* (1952), 230 Ind. 431, 438, 104 N. E. 2d 721; *Hansen* v. *State* (1952), 230 Ind. 635, 639, 106 N. E. 2d 226; *Harrison* v. *State* (1952), 231 Ind. 147, 168, 106 N. E. 2d 912; *Bowens* v. *State* (1952), 231 Ind. 559, 562, 563, 109 N. E. 2d 91; *Shutt* v. *State* (1954), 233 Ind. 169, 117 N. E. 2d 892." *Baker* v. *State* (1956), 236 Ind. 55, 60, 61, 138 N. E. 2d 641.

"From an examination of the entire record in this case we are unable to see how any prudent man could find appellant had been proved guilty beyond a reasonable doubt. In such a case the issue becomes one of law for the decision of this Court." *Lee* v. *State* (1954), 233 Ind. 176, 118 N. E. 2d 115; *Osbon* v. *State* (1938), 213 Ind. 413, 428, 13 N. E. 2d 223.

The verdict of the jury was not sustained by sufficient evidence of probative value and therefore was contrary to law. The appellant's motion for a new trial should have been granted and the denial thereof constitutes error that required a reversal of the judgment.

The cause should be reversed and remanded to the trial court with instructions to sustain appellant's motion for a new trial and for further proceedings not inconsistent with this opinion.

NOTE.—Reported in 244 N. E. 2d 89.