DUNN *v.* STATE OF INDIANA.

[No. 29,411. Filed December 19, 1957.]

*Cecil C. Tague, Sr.,* of Brookville, for appellant.

*Edwin K. Steers,* Attorney General, and *Owen S. Boling,* Deputy Attorney General, for appellee.

EMMERT, C. J.—This is an appeal from a judgment on a verdict that appellant was guilty of assault and battery, that he be imprisoned in the Indiana State Farm for a term of six (6) months, and be fined Six Hundred Dollars ($600). The error assigned on appeal is the overruling of appellant's motion for new trial.

The motion for new trial challenges the sufficiency of the evidence to sustain the verdict. We have carefully read and reread the record of the trial court in this cause, and, giving the State full benefit of the rule that only that evidence favorable to the State will be considered on appeal, we believe the verdict was not sustained by sufficient evidence.

The appellant, on August 25, 1955, resided on the Lon Masters farm, sometimes known as the Midway Farm, near Laurel, Indiana. He had been with the decedent, Floyd Gerrian, from 9:30 on the morning of that day as the decedent complained of having "spells" with his side so that he could hardly raise his arm and wanted the appellant to drive his truck. The appellant had known the decedent all his life, and drove the truck for him. They met that morning in a tavern and drove from there to the decedent's son Charles' place where there was work done on a mower and other business transacted. The decedent had a bottle of liquor and each drank from it at that time. From there they proceeded back to the tavern where they stopped and had "another beer." Next they proceeded to "Huntington's place" south of road 52 close to Chapel, Indiana, where the decedent bought Huntington's interest in a portable elevator, which was then hooked to the truck and taken back to Charles' place. The appellant and decedent then stopped again at the tavern where they had another beer and picked up an acquaintance, William Childers.

The decedent purchased another pint of whiskey and the three men left the tavern about 1:30 to 2:00 in the afternoon for the appellant's place to which he had invited the other two for dinner. At the appellant's place they joined the appellant's wife and seventeen-

year-old step-daughter at dinner. After dinner the men continued drinking.

In the ensuing conversation the decedent brought up an incident in which the appellant's step-daughter had allegedly over-stated the number of crates of tomatoes she had picked while employed by the decedent. Whereupon the appellant placed a dollar on the kitchen table at which they were sitting, but the decedent refused to take it. The step-daughter became upset and cried, left the room, going upstairs to her bedroom. Some time after 3:00 o'clock in the afternoon the appellant left to buy more beer.

When appellant left, William Childers went upstairs and urged the step-daughter to join the rest in the kitchen. As he left the girl's room the decedent entered it and remained there while Childers returned to the kitchen. The decedent was absent about five minutes, and as Childers later testified, the girl was heard to scream four or five times. The decedent returned to the kitchen and was there when the appellant returned from Laurel.

The appellant in his testimony said that his step-daughter told him that the decedent had tried to molest her. Her dress was torn. On cross-examination Childers testified that he didn't get the girl's exact words but that she said that the decedent had been molesting her. The decedent "Set down and jawed a little bit—didn't do anything for a while," according to Childers. Then he got up, "Walked around behind me and said MIER, I am going to whip you." Mier told Floyd that he was the best friend he ever had. "FLOYD hit him." Then they both went to fighting. Floyd went down to his knees.

All the testimony indicates that at this point the

appellant helped the decedent to a chair. Childers testified on direct examination that Mier told the decedent that he was the best friend he, the appellant, ever had and not to hit him any more. The uncontradicted evidence shows that about fifteen minutes elapsed during which the parties "jawed." Childers testified that the decedent, " . . . got up and walked around and said MIER, you cannot whip me. Wasn't anything said. Just went to hitting each other." Childers stated that the decedent was not out of his sight from the time they arrived at the appellant's place until he fell to the floor and was found to be dead, except for the five minutes the decedent was upstairs. On cross-examination in response to a question whether he had seen the appellant at any time attempt to strike the decedent until the decedent had struck him, Childers answered in the negative.

The decedent after the second encounter staggered and fell, hitting the back of his head. He was dead in a short time. The pathologist's report of the autopsy indicated there existed extensive hemorrhage around the brain sufficient to press on vital centers causing death. The step-daughter testified that in defending herself from the decedent's advances in her bedroom she twice struck him as hard as she could on the head with a broom, and that he tore her clothes.

Childers was the only witness the State presented as to the affray and his testimony was insufficient to convict. Nor did he contradict in any material respect the witness for the appellant. There was no evidence that any severe blows had been struck by either man. The parties were acquaintances of long standing. They had been drinking together on that morning. The decedent was a guest in the appel-

lant's home. He was a larger man than the appellant who repeatedly avowed his friendship and asked the decedent not to hit him. The decedent who took advantage of the appellant's absence to force his attentions upon the step-daughter was the aggressor in twice assaulting the appellant. The appellant was where he had a right to be, and the decedent was forcing him to fight. It was not necessary that the appellant should flee from his home in order to avoid the fight thus thrust upon him. *Miller* v. *State* (1881), 74 Ind. 1, 6.

This court has stated in *Runyan* v. *State* (1877), 57 Ind. 80, 84, "The weight of modern authority, in our judgment, establishes the doctrine, that, when a ■ person, being without fault and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable." The only reasonable inference from the State's testimony is that appellant was exercising his right of self-defense.

From an examination of the entire record in this case we are unable to agree that the appellant's action in defending himself was an unlawful touching ■ required by the statute, nor can we hold they fought by mutual consent. The answer brief by the State does not contest this analysis of the evidence. In such case the issue becomes one of law for the decision of this court. *Baker* v. *State* (1956), 236 Ind. 55, 138 N. E. 2d 641, 648; *Lee* v. *State* (1954), 233 Ind. 176, 118 N. E. 2d 115; *Osbon* v. *State* (1938), 213 Ind. 413, 13 N. E. 2d 223. The verdict was not sustained by sufficient evidence and was contrary to law.

Judgment reversed, and new trial ordered.

Bobbitt, Landis, Achor and Arterburn, JJ., concur.

NOTE.—Reported in 146 N. E. 2d 529.